Craig LESSER and Marilyn S. Lesser, Doing Business As LSR Industries, Inc., Petitioners,

v.

Michael ESPY, Secretary of Agriculture, Respondent.

No. 93–2826.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1994.

Decided Aug. 30, 1994.

Curry First (argued), First, Blondis, Albrecht, Bangert & Novotnak, S.C., Milwaukee, WI, for petitioners.

Margaret M. Breinholt, Raymond Fullerton, Dept. of Agriculture, Office of the Gen. Counsel, Stephen M. Reilly (argued), U.S. Dept. of Agriculture, Office of Gen. Counsel, Washington, DC, for respondent.

Before FLAUM and ROVNER, Circuit Judges, and CRABB, District Judge.*

FLAUM, Circuit Judge.

Congress enacted the Animal Welfare Act, 7 U.S.C. §§ 2131–2159, to expand the regulation of animals used in scientific research. 7

---

* The Honorable Barbara B. Crabb, Chief Judge of the Western District of Wisconsin is sitting by designation.

U.S.C. § 2131(1). The Act authorizes the Secretary of Agriculture to promulgate standards that govern the handling, care, treatment, and transportation of such animals. 7 U.S.C. § 2143. The Act also empowers the Secretary to issue licenses to those who deal in such animals. 7 U.S.C. § 2133. To facilitate compliance with the Act (and the standards promulgated thereunder), agents of the Secretary are authorized to inspect each dealer's facilities, animals, and records concerning the transportation, receiving, handling, and delivery of the animals. 7 U.S.C. § 2146(a). No search warrant or other process is mentioned under the Act. If the Secretary finds that the Act was violated or that his standards were not complied with, he may, after notice and an opportunity for a hearing, suspend or revoke the dealer's license, 7 U.S.C. § 2149(a), and assess a civil penalty of as much as $2500 per day for each day of each violation. 7 U.S.C. § 2149(b).

The petitioners, Craig and Marilyn Lesser of Union Grove, Wisconsin, are licensed dealers of long-eared, short-tailed lagomorphs with long hind legs—better known as rabbits. They breed and sell from 15,000 to 20,000 of these creatures each year to research institutions across the United States. In October 1990, the Administrator of the Animal and Plant Health Inspection Service (APHIS) charged the Lessers with failing to satisfy various standards and with unlawfully refusing to allow inspections of their rabbitry on five occasions between September 1989 and August 1990. An Administrative Law Judge (ALJ) found that numerous standards with which the Lessers had not complied and that the Lessers' refusal to permit inspections of their rabbitry constituted a violation of the Act. He imposed a civil penalty of $9250 and suspended the Lessers' license "for 30 days and thereafter until [their] facility is found to be in compliance with the Act and the regulations and standards thereunder."

The Lessers appealed the ALJ's decision to the Judicial Officer—the individual to whom the Secretary has delegated his authority to act as the final deciding officer for the Department of Agriculture. 7 C.F.R. § 2.35(a). The Judicial Officer affirmed the ALJ's decision and increased the $9250 penalty by $500. The Lessers then petitioned this court for review of the Judicial Officer's decision. 7 U.S.C. § 2149(c). They claim that, in inspecting and attempting to inspect their rabbitry without a warrant, the APHIS violated their right guaranteed by the Fourth Amendment to be free from unreasonable searches, and that the sanction imposed by the Secretary is excessive. After due consideration we deny the petition for review.

I

Craig Lesser started the rabbitry, LSR Industries, as a teenager in 1974. Through LSR the Lessers sell what is known in the industry as "clean" rabbits which are to be used in sensitive laboratory research. LSR's customers demand that it supply healthy, disease-free rabbits lest their research suffer. The Lessers apparently had no problems with customers or even APHIS inspectors until 1989 when a new APHIS veterinarian, Elizabeth Goldentyer, was appointed to inspect facilities in their area. The inspector prior to Goldentyer, Donald Leonard, had conducted inspections of the Lesser rabbitry since 1976 and had been refused inspection by Craig Lesser only on one occasion on which Leonard was wearing soiled coveralls. Leonard's supervisor, A.R. McGlaughlin, subsequently admonished Leonard that he was required to wear a separate pair of clean overalls for each inspection, because soiled overalls could endanger the rabbits by introducing a sickness into Lesser's disease-free breeding colony.

The outgoing inspector, Leonard, reported that the Lessers maintained a good facility and that they usually corrected any deficiencies that he found. Nevertheless, a deficiency reported in September 1986—small cracks in the floor and unsealed wood in the interior beams—had not been corrected at the time of Leonard's last inspection in February 1989. In May 1989, Goldentyer, the new inspector, visited the Lesser rabbitry, but apparently was unable to cultivate the same working relationship with the Lessers as Leonard. During the first inspection Marilyn Lesser was present at the facility and gave her consent for Goldentyer to inspect. Although Goldentyer found the animals to be

healthy, she also noted the following minor infractions: (1) some cages were less than the minimum size for the rabbits, (2) a marginal build-up of animal waste had developed under some of the cages, (3) one cleaning scoop was not working properly, (4) one bag of rabbit food was left open, (5) the lighting was too dim for the rabbits' comfort, and (6) some of the cages also had an apparent build-up of rabbit hair and waste pellets in the vents. Goldentyer's careful inspection also noted that the small cracks in the floor and the interior wood beams were still not fixed. Goldentyer informed the Lessers that she would return to monitor their compliance.

As promised, Goldentyer returned to monitor the Lesser rabbitry four more times between September 1989 and May 1990. While no inspections took place during this period, a seemingly antagonistic relationship developed between Goldentyer and the Lessers. On September 17, 1989, Marilyn Lesser refused inspection after telephoning Craig Lesser, who was out of town. Goldentyer returned on December 14, 1989, and was told by an employee of the rabbitry that the Lessers were out of town. The employee said that she was not authorized to allow an inspection. The next two attempted inspections took place on February 20 and May 4, 1990. Marilyn Lesser was present on both occasions, but refused to allow an inspection because her husband, who was out of town, told her that he was to be present during inspections.

In January 1990, Craig Lesser had written a letter to Franklin Kriewald, an APHIS supervisor, in which he stated that the rabbitry could be inspected any time that he was present and that because he doubted Goldentyer's objectivity Lesser was looking for a manager to supervise the inspections when Lesser could not be present. Lesser also requested in the letter that inspectors not inspect his facility within 72 hours after visiting another animal facility because of his concern about disease transmissions. Kriewald replied by letter that inspectors had the authority to conduct unannounced, warrantless searches and that the refusal to allow an inspection would violate the Animal Welfare Act and would be grounds for prosecution.

On August 24, 1990, Goldentyer and Ellen Magid, another inspector, showed up at the Lesser rabbitry to conduct an inspection. Craig Lesser was present and met with them in his office. Lesser began the meeting by asking Goldentyer where she and her co-inspector had been that day and the types of facilities that they had inspected. Goldentyer would only confirm that they had not inspected any rabbits in the previous few days and that she planned to take what she considered to be reasonable precaution to prevent the transmission of disease. While Lesser testified that he had agreed to allow an inspection, he also insisted that for fear of disease transmission no one, except himself, would actually handle the animals. Lesser also refused to grant Goldentyer permission to enter certain parts of the property which he felt were unnecessary for the inspection (LSR is located on the same piece of land as the Lessers' home residence perhaps causing some confusion as to what is business and what is personal). Finally, demonstrating his apparent doubt of Goldentyer's lack of objectivity, Lesser demanded that the inspector not "write down the picky problems." This exchange between Goldentyer and Lesser apparently became heated. Goldentyer responded that she could not conduct an inspection within the limitations that Lesser wanted to impose and that she could not allow Lesser to determine what she did and did not record in her inspection report. Goldentyer left without conducting an inspection. The complaint charging the Lessers with violating the Animal Welfare Act and the Secretary's standards ensued.

Craig Lesser testified at the hearing before the ALJ that the deficiencies noted by Goldentyer had been or were to be corrected. He further testified that he had told his wife not to allow any unannounced inspections when he was not at the facility because of his concern about disease transmission. As for his conduct at the August 1990 meeting, Lesser stated that Goldentyer refused to wear the protective clothing he provided to all visitors. Both Craig and Marilyn Lesser said that they would not refuse to allow inspections in the future.

The total civil penalty of $9250 imposed by the ALJ was comprised of a penalty of $250 for the lighting violation cited by Goldentyer; $500 for the cage-size violation cited by Goldentyer; $1000 for the cracks in the floor and unsealed wood cited by Leonard and Goldentyer; $500 for the Lessers' first refusal to allow an inspection; $1000 for the second; $1500 for the third; $2000 for the fourth; and $2500 for the fifth. The ALJ found that suspension of the Lessers' license for at least 30 days was appropriate because Craig Lesser had prevented inspections after being specifically warned by Franklin Kriewald of the APHIS that his conduct was unlawful. The ALJ did not address the issue whether the warrantless searches of their rabbitry ran afoul of the Fourth Amendment, finding that the Lessers had not raised that issue.

In affirming the ALJ's decision, the Judicial Officer found that the $9250 penalty was not too severe; in fact, he found that the penalty was not severe enough, raising it by $500 for the sanitation and waste violations cited by Goldentyer. With respect to the Fourth Amendment issue, the Judicial Officer found that the Lessers had forfeited their right to raise it in their administrative appeal by failing to present it at their hearing before the ALJ. The Judicial Officer noted that, if the issue had been preserved, he would have found that the warrantless inspections did not violate the Fourth Amendment.

## II

The Lessers' principal argument is that, in inspecting and attempting to inspect their rabbitry without a warrant, the APHIS violated their right guaranteed by the Fourth Amendment to be free from unreasonable searches.[1] We begin with the proposition that the Fourth Amendment's prohibition

against unreasonable searches and seizures applies to administrative inspections of private commercial property. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978). An owner or operator of a business thus has a reasonable expectation of privacy in commercial property. This expectation, however, is different from, and indeed somewhat less than, the privacy expectation in one's home. *See Donovan v. Dewey*, 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2537–38, 69 L.Ed.2d 262 (1981). While a search of a private residence generally must be conducted pursuant to a warrant in order to be reasonable, *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), a warrantless administrative search of commercial property does not *per se* violate the Fourth Amendment.

In *Marshall v. Barlow's, Inc.*, *supra*, 436 U.S. at 313, 98 S.Ct. at 1820–21, the Court stated that in "closely regulated" industries—namely, those which have long been subject to close supervision and inspection—the privacy interests of business owners may be so attenuated, and the government's interest in regulating the particular industry so strong, that a warrantless inspection of the commercial premises might be reasonable within the meaning of the Fourth Amendment. *Barlow's* involved attempted warrantless searches of the work areas of an electrical and plumbing installation business by agents of the Secretary of Labor pursuant to § 8(a) of the Occupational Safety and Health Act of 1970, (OSHA), 29 U.S.C. § 657(a). The Court held that the attempted searches were unreasonable principally because the numerous and varied businesses regulated by OSHA—all businesses engaged in or affecting interstate commerce that have employees—did not comprise a "closely regulated" industry. 436 U.S. at 313–14, 98 S.Ct. at 1820–21.

---

1. As we have noted, the Judicial Officer found that the Lessers forfeited this issue by not raising it in their hearing before the ALJ. Generally, a litigant forfeits appellate review of an issue by not raising it below. The Lessers argue, however, that their failure to raise the Fourth Amendment issue before the ALJ does not bar appellate review of the issue because the rules governing proceedings before ALJs in the Department of

Agriculture suggest that constitutional issues cannot be raised. They assert that they properly raised the issue for the first time in their appeal to the Judicial Officer and that the Judicial Officer decided the issue. These are interesting arguments, but we need not address them here because a defense of forfeiture can itself be forfeited, and the Secretary has not raised forfeiture as a defense.

In *Donovan v. Dewey, supra,* 452 U.S. at 602–03, 101 S.Ct. at 2539–40, the Court reached the opposite result with respect to warrantless inspections of underground and surface mines by agents of the Secretary of Labor. These inspections were authorized by § 103(a) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 813(a). The Court pointed out that the commercial premises exception to the warrant requirement is defined by "the pervasiveness and regularity of the federal regulation" and the effect of such regulation upon a business owner's expectation of privacy rather than by the length of time during which the business in question had been subject to federal regulation. *Id.* at 600, 605–06, 101 S.Ct. at 2541–42. Thus, the Court held that the warrantless searches authorized by § 103 of the Act—unannounced inspections of underground mines at least four times annually and surface mines at least twice a year—were reasonable even though federal regulation of mines was of relatively recent vintage, having come about only 15 years earlier. *Id.* at 606, 101 S.Ct. at 2542. The Court did note, however, that the "duration of a particular regulatory scheme" would remain an "important factor" in deciding whether a warrantless inspection pursuant to a legislative scheme is permissible. *Id.*

The Supreme Court most recently addressed the "closely regulated industry" exception to the warrant requirement in *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), where it synthesized the test that governs our decision today. The issue before the Court in *Burger* was whether a New York statute that authorized police officers to make warrantless inspections of automobile junkyards in order to deter the possession, sale, and transfer of stolen automobiles and parts, fell within the exception. The Court held that the warrantless searches authorized by the statute fell within the exception.

■ The test employed by the Court in reaching its holding has four steps. First it must be determined whether governmental regulation of the industry in question is "pervasive." *Id.* at 700–02, 107 S.Ct. at 2642–44. Governmental regulation is "pervasive" if the regulatory presence is so comprehensive and defined that the business owner cannot help but be aware that his commercial property will be subject to periodic inspections undertaken for specific purposes. *Id.* at 705 n. 16, 107 S.Ct. at 2645 n. 16 (citing *Donovan v. Dewey,* 452 U.S. 594, 600, 101 S.Ct. 2534, 2538–39, 69 L.Ed.2d 262 (1981)). Nevertheless, even if this requirement is met, a warrantless inspection of a business in a pervasively regulated industry will not be considered reasonable unless three additional criteria are met. *Burger,* 482 U.S. at 702–03, 107 S.Ct. at 2643–44. First, there must be a substantial governmental interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. And, finally, the statute's inspection program must perform the two basic functions of a warrant: it must advise the owner of the premises that the search is being conducted pursuant to the law and within a properly defined scope; and it must limit the discretion of the inspecting officers. *Id.* at 702, 107 S.Ct. at 2643.

■ Application of the *Burger* test to the facts of this case demonstrates that on balance a search conducted by the APHIS pursuant to the Animal Welfare Act fits within the exception to the warrant requirement for "closely regulated" industries. First, governmental regulation of rabbitries that breed and sell rabbits for use in research is arguably pervasive. The Animal Welfare Act and the standards promulgated thereunder by the Secretary regulate many facets of the business. A license and the payment of a fee are required to engage in the sale of rabbits to a research institution. 7 U.S.C. §§ 2133, 2134; 9 C.F.R. §§ 2.1–2.6. The operator of a rabbitry who sells rabbits for use in research cannot transport, purchase, sell, house, care for, or handle his rabbits without being subject to the Act or a standard. 7 U.S.C. § 2131; 9 C.F.R. §§ 3.50–3.66. He must make and maintain records concerning the purchase, sale, transportation, identification, and previous ownership of his rabbits. 7 U.S.C. § 2140; 9 C.F.R. § 2.75. And he is subject to loss of his license, 7 U.S.C. § 2149(a), civil penalties, 7 U.S.C. § 2149(b),

and even criminal penalties, 7 U.S.C. § 2149(c), for failure to comply with the Act and the standards.

The Lessers argue that the selling of rabbits intended for use in research cannot be considered "pervasively regulated" because the business does not have a long history of regulation. They cite cases involving industries with long histories of regulation, *see, e.g., United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (selling of firearms); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (selling of liquor); *United States v. Jamieson–McKames Pharmaceuticals, Inc.,* 651 F.2d 532 (8th Cir.1981) (manufacturing of pharmaceuticals); *Marshall v. Nolichuckey Sand Co.,* 606 F.2d 693 (6th Cir.1979) (mining of sand and gravel), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980), and assert that, in each of these cases, the long history of regulation controlled the question whether the industry at issue was pervasively regulated. In *Burger,* however, the Court stated plainly that the duration of regulation of the industry in question is just one factor relevant to the determination of whether the industry is "pervasively regulated." 482 U.S. at 700–02, 107 S.Ct. at 2643.

The *Burger* Court found that the automobile junkyard industry was "pervasively regulated," even though regulation of that industry was a relatively recent phenomenon, because the provisions of the statute regulating the activities of a junkyard owner were extensive: in order to engage in the junkyard business, an operator must—obtain a license; maintain records and make them available for inspection; and prominently display the vehicle identification number at his place of business, on business documentation, and on vehicles and parts that passed through his business. An operator who fails to comply with the statute risks civil fines, loss of his license, and criminal penalties. 482 U.S. at 703–05, 107 S.Ct. at 2644–45. Because the regulations were so extensive, the junkyard owner could not have had a reasonable expectation of being free from warrantless inspections. The regulations governing the sale of rabbits for research appear to be comparatively as extensive as the regulations governing the automobile junkyard industry at issue in *Burger.* Thus, unless the short duration of regulation of the business of selling research animals created in the Lessers a reasonable expectation that they would be free from warrantless searches, the business of selling research animals should be considered pervasive.

The effect of the short duration of regulation of the sale of rabbits for research does not outweigh the effect of the degree of regulation. When Craig Lesser started the rabbitry in 1974, the federal government had already been regulating and conducting warrantless searches of rabbitries for eight years: first pursuant to the Laboratory Animal Welfare Act, *see* Pub.L. No. 89–544, 80 Stat. 350 (codified as amended at 7 U.S.C. §§ 2131–2158), and then pursuant to the Animal Welfare Act of 1970. The Lessers submitted to warrantless inspections of rabbitries by agents of the APHIS for at least 12 years (it is unclear from the record whether any inspections were conducted between 1974 and 1976). They cannot now argue that, because regulation of their rabbitry came about after the regulation of gun shops, liquor stores, and coal mines, they did not reasonably expect to have their rabbitry subjected to warrantless inspections.

While one may debate why the regulation of rabbitries is a federal matter, the use of rabbits and other animals for research is instrumental in advancing knowledge of cures and treatments for diseases and injuries that afflict both humans and animals across the nation. Arguably by taking measures to assure that the animals are accorded the basic creature comforts, the federal government may be of some benefit to this research. While market forces may drive sellers of unhealthy research animals out of business (as research institutions must necessarily shun defective animals that would tarnish critical science) the expansive reading of the commerce clause undoubtedly allows for federal regulation of the treatment of animals intended for use in research. *See Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (standing for the proposition that the commerce clause pres-

ents a rather low hurdle to Congress' power to regulate, even over agricultural matters that appear to be of indirect national impact).

Our next inquiry, whether warrantless inspections are necessary to further the regulatory scheme, presents a closer question. In *United States v. Biswell, supra*, 406 U.S. at 316, 92 S.Ct. at 1596, the Supreme Court observed that

> if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility of time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.

In this case, if the APHIS is to be successful in regulating the treatment of animals intended for use in research, it should be allowed to inspect the facilities with some uniform regularity. In rabbit farming many of the potential deficiencies that would violate the Act can be quickly concealed. *See, e.g.*, 9 C.F.R. §§ 3.50(c) (improper storage of food); 3.50(d) (improper waste disposal); 3.50(e) (unclean washrooms); 3.56(a) (unsanitary primary enclosures). Thus the Department correctly observes that preserving the element of surprise and the possibility of frequent inspections is necessary in order to detect violators. In response the Lessers rightly point out that the element of surprise may be easily maintained even with a warrant requirement—a warrant may be issued *ex parte* and executed without prior notice. *See, e.g., Barlow's*, 436 U.S. at 316, 98 S.Ct. at 1822. Nevertheless, we believe a warrant requirement for the most routine inspection would interfere with the Department's ability to function and unnecessarily increase the cost of the Secretary's operations without a significant increase in privacy, especially since all licensed suppliers of research animals have a reasonable expectation of at least a couple of regular inspections by APHIS each year.

We are also convinced that the Act's inspection program provides a constitutionally adequate substitute for a warrant. The *Burger* Court found that this requirement

was met for three reasons: (1) The New York statute in question alerted automobile junkyard owners that their commercial premises would be subject to periodic inspections pursuant to the statute; (2) the statute set forth the scope of the inspection and notified the operator as to who was authorized to conduct an inspection; and (3) the statute limited the time, place, and scope of the inspections. 482 U.S. at 711, 107 S.Ct. at 2648.

Similarly, in this case, the Act alerted the Lessers that their rabbitry would be subject to periodic inspections by providing that "the Secretary shall make such investigations or inspections as he deems necessary to determine whether any dealer ... has violated or is violating any provision of [the Act] or any regulation or standard issued thereunder." 7 U.S.C. § 2146(a). The Act also sets forth the scope of the inspections. It states that the Secretary shall ... have access to the places of business and the facilities, animals, and those records required to be kept pursuant to section 2140 of this title of any ... dealer." 7 U.S.C. § 2146(a). The terms "facilities" and "animals" are defined in the Act. *See* 7 U.S.C. § 2132(g). The records subject to inspection are defined by the Act as those relating to "the purchase, sale, transportation, identification, and previous ownership of the animals." 7 U.S.C. § 2140. These records are described in detail in regulations promulgated by the Secretary. *See* 9 C.F.R. § 2.75. The Act also informs dealers as to who is authorized to conduct inspections. Under the Act, "the Secretary," 7 U.S.C. § 2146(a), who is defined as an "employee of the Department of Agriculture," is authorized to conduct inspections. The regulations are more explicit, stating that "APHIS officials" are authorized to make inspections. 9 C.F.R. § 2.126. Finally, the Act and regulations also limit the time, place, and scope of the inspections. The Act provides that the Secretary shall have access to a dealer's facilities, animals, and records for an inspection "at all reasonable times." 7 U.S.C. § 2146(a). Again, the regulations are more explicit. Section 2.126(a) provides that each dealer must allow inspections of his facilities, animals, and records "during business hours." "Business hours" is defined in the

regulations as "a reasonable number of hours between 7 a.m. and 7 p.m., Monday through Friday, except for legal Federal holidays, each week of the year." 9 C.F.R. § 1.1. An inspector is authorized to enter the dealer's place of business; to examine records required to be kept by the Act and the regulations; to make copies of the records; to inspect and photograph the facilities, property and animals; to document conditions and areas of noncompliance; and to use a room, table, or other facilities necessary for examination of the records and inspection of the property and animals. 9 C.F.R. § 2.126(a)(1)–(b). The scope of the inspections thus is only as broad as is necessary to assure compliance with the Act and standards. For this reason, the Eighth Circuit held in *Western States Cattle Co. v. Edwards,* 895 F.2d 438, 442 (8th Cir.1990), that warrantless inspections similar to those at issue in this case did not run afoul of the Fourth Amendment.

█ Although we have determined that on balance the Act and its regulations provide a constitutionally adequate substitute for a search warrant during routine searches, we will note one aspect of the regulatory scheme that still gives us some pause—the possibility of harassment through an abuse of authority by either excessive inspection or selective enforcement should personal animus arise. In *Burger,* the Court stressed that warrantless searchers will be tolerated only so long as the impact on the inspected's property and business operations is no more than that *necessary* to further the overall regulatory scheme. 482 U.S. at 700–02, 107 S.Ct. at 2642–44. While a uniform number of inspections conducted in the due course of the regulatory scheme may be tolerated without a warrant, once an individual begins to receive distinctive treatment without apparent justification (such as more inspections than the regular schedule would indicate) oversight such as that provided by the warrant process may be required to assure that the inspected's Fourth Amendment guarantees are met. *Id.*

Finally, as to the Lessers' allegation that the inspectors disregarded the safety of LSR's rabbits we respond that as was the case with the prior inspector (Leonard's wearing soiled coveralls to LSR provided the petitioners with enough cause for concern justifying their refusal of inspection), had a hearing showed that Goldentyer's conduct unnecessarily impacted LSR's operations, then of course the Lessers would not have suffered any fine or penalty for refusing inspection and the inspector would need to have been admonished. In this case, however, no evidence established that Goldentyer actually endangered the Lessers' animals with the possibility of contamination. Therefore the Lessers had no proven excuse for denying Goldentyer access.

### III

█ The Lessers also argue that the civil penalty of a $9250 fine and a 30–day suspension of their license was excessive. Our review of the sanctions imposed by the Secretary is limited. Where, like here, Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy, " 'the relation of remedy to policy is peculiarly a matter for administrative competence.' " *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC,* 329 U.S. 90, 112, 67 S.Ct. 133, 145–46, 91 L.Ed. 103 (1949)). Thus, we will overturn the Secretary's choice of sanction only if we find it unwarranted in law or without justification in fact. *Id.,* 411 U.S. at 185–86, 93 S.Ct. at 1457–58.

The Lessers do not challenge the Secretary's determination that they failed to comply with six standards and that they committed five violations of the Act by refusing to allow inspections. They challenge the severity of the penalty for these eleven violations. The Act provides that "[t]he Secretary shall give due consideration to the appropriateness of the penalty with respect to the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations." 7 U.S.C. § 2149. We accept that the Judicial Officer gave due consideration to these factors before imposing the penalty. Before imposing the penalty, the Judicial Officer noted that the Lesser rabbitry sold 15,000 to 20,000 rabbits each year, that the rabbits had a reputation for being clean, and that the Lessers had a history of compliance with the Act.

**1310**

He also found, however, that the failure to remove animal waste and the blocked cage ventilation violation were serious deficiencies that could have resulted in serious harm to the rabbits. And he found that the Lessers had made no attempt to correct the lighting violation. As to the overcrowding violation and the existence of unsealed wood in the rabbitry, the Judicial Officer found that these were deficiencies that the Lessers had willfully allowed to exist for a long period of time. With respect to the Lessers' repeated refusals to allow inspections, the Judicial Officer found that these refusals were "manifestly willful" and in bad faith.

The Lessers argue that most of the deficiencies were trivial and, as such, did not justify such harsh sanctions. To this we must respond that it is not our role to assess the triviality or seriousness of the deficiencies. That role belongs to the Secretary. Our limited function is to determine whether there is factual support for the sanctions and, if so, whether the sanctions imposed by the Secretary for the deficiencies are lawful. Here, the Lessers do not dispute the factual basis for the sanctions, and the Secretary acted within his authority under the Act in imposing the sanctions that he imposed.

DENIED.