S.L., P.W., B.S., individually and on behalf of all others similarly situated, et al., Plaintiffs–Appellees, Cross–Appellants,

v.

Gerald WHITBURN, in his official capacity as Secretary of the Department of Health and Social Services of the State of Wisconsin, J. Jean Rogers, in her official capacity as Administrator of the Division of Economic Support of the Department of Health and Social Services of the State of Wisconsin, and Thomas Brophy, individually and in his official capacity as Director of the Milwaukee County Department of Human Services, Defendants–Appellants, Cross–Appellees.

Nos. 94–3213, 94–3248 and 94–3292.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1995.

Decided Oct. 6, 1995.

1300

Michael J. Fitzgerald, Coffey, Coffey & Geraghty Milwaukee, WI, Shirin Cabraal, Jeffrey R. Myer (argued), Legal Action of Wisconsin, Milwaukee, WI, Louis M. Bograd, Washington, DC, for S.L., P.W., B.S., M.A. and H.B.

Donald P. Johns (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Gerald Whitburn and J. Jean Rogers.

John F. Jorgensen (argued) Office of the Corporation Counsel, Milwaukee, WI, for Thomas Brophy.

Helen Hershkoff, American Civil Liberties Union Foundation, New York City, for S.L., P.W., B.S., and H.B.

Before BAUER, CUDAHY, and MANION, Circuit Judges.

MANION, Circuit Judge.

The plaintiffs in this class action receive benefits through the Food Stamp and Aid to Families with Dependent Children programs. They brought suit alleging that the procedures used by the defendants to verify eligibility for these public assistance programs violated certain federal regulations as well as the Fourth and Fourteenth Amendments. The district court certified the class and later it granted, in large part, the plaintiffs' motion for summary judgment. In its decision, the court found that several of the verification procedures used by the defendants violated applicable federal regulations, as well as the Fourth and Fourteenth Amendments. As a result, the court enjoined the defendants from using those verification procedures. On this interlocutory appeal both parties challenge the injunction issued by the district court. For the reasons stated herein we affirm in part, and reverse in part, the district court's decision, and remand the case so the district court can enter an injunction consistent with this opinion.

## I. Background

The plaintiffs in this class action applied for or receive public assistance under the Food Stamp Act, 7 U.S.C. § 2011 et seq., ("FSA"), and the Aid to Families with Dependent Children section of the Social Security Act, 42 U.S.C. § 601 et seq. ("AFDC"). In Wisconsin, the administration and oversight of these programs is the responsibility of the Wisconsin Department of Health and Social Services ("DHSS"). But the Depart-

ment of Social Services–Milwaukee Branch (the "County"), administers the programs in Milwaukee County.[1] In Wisconsin, a single application process covers both programs.[2] Pursuant to that process, an applicant submits a combined Food Stamp and AFDC application which contains detailed information concerning his or her household circumstances. A caseworker reviews the completed application and then interviews the applicant. The application is then subject to verification to ensure that the information provided is accurate and that the applicant is eligible for public assistance. Federal, state, and county regulations govern this verification process.

Under the County's current policy, if the information provided to a case worker is insufficient to verify eligibility, or if a caseworker believes that an applicant may not be eligible for benefits, then the case is designated for verification. Currently, caseworkers use written criteria to help them determine whether an application needs to be verified. That criteria is taken from the DHSS's Model Fraud Plan and is a nonexhaustive list of factors associated with "error-prone" applications for public assistance. Based on the criteria that is part of this "error-prone profile" a caseworker can authorize a home visit if he believes the information provided is questionable. (The examples given include cases where the information provided by the applicant is inconsistent or contradictory and cannot be resolved by the caseworker.) The caseworker thus has great discretion in determining whether an application needs further verification, although he is required to identify the basis for his decision.

If the caseworker believes that an applicant may not be eligible, the case is referred to an investigative service that has been hired by the County to verify eligibility. Verification could include a home visit. Plaintiffs challenge the use of a home visit on statutory and constitutional grounds. The County does not obtain a search warrant for the purpose of conducting the home visit. At present, the County notifies the applicant that a field representative will be visiting his home some time in the next ten days. The current County regulations state that home visits must be conducted between 8:00 a.m. and 8:00 p.m., and recommend that home visits take place during normal business hours unless there are special circumstances (the examples given are cases where an applicant's work hours require late visits or where a field representative has made two unsuccessful attempts to contact an applicant). The County does not contact the applicant to schedule the exact date or approximate time of the visit.

Under the County's current policy, when the field representative makes contact with the applicant, he identifies himself as a field representative for the County and asks to be admitted to the home. The representative is not permitted to enter the home without consent. The representative is allowed to tell the applicant that refusal may delay the provision of public assistance, but he may not tell the applicant that assistance will be automatically denied if permission to enter is refused. The representative is required to tell the applicant that he or she can retract consent at any time. Once inside, the representatives are instructed that anything that is in plain view and pertinent to eligibility can be noted. Otherwise, however, field representatives are told to limit their investigation to the criteria of eligibility that the caseworker has designated as in need of verification. Field representatives may ask to see areas of the residence, and they can ask for permission to inspect closets, cabinets, attics, basements, garages, etc., but they are forbidden to inspect these areas without the resident's consent.

The plaintiffs also challenge the County's practice of verifying eligibility through so-called "collateral contacts," i.e., third parties that can be reasonably expected to furnish reliable information. Currently, the County does not allow applicants to designate collateral contacts, but simply relies on investiga-

---

**1.** Unless otherwise noted, we refer to the defendants collectively as the "County."

**2.** Unless otherwise indicated, we use the term "application" to refer both to the application for benefits and to the periodic "recertification" of eligibility to receive benefits.

tors to select and contact suitable third parties. Frequently, the field representatives contact landlords, employers, school officials, neighbors, and utility services. Investigators are permitted to identify themselves as County representatives, if asked, and are allowed to explain that they are verifying information provided by the applicant. They are also free to explain that they are not pursuing a criminal investigation, and that the applicant has not been involved in any wrongdoing. Under the current policy, collateral contacts can only be used to verify information that is questionable or unknown; collateral contacts cannot be used merely to confirm information that has already been satisfactorily verified.

Basically, the plaintiffs assert that the federal regulations governing the Food Stamp program and the Fourth and Fourteenth Amendments require the County to (1) use home visits as a method of verification only if documentary evidence is insufficient to verify eligibility for public assistance, (2) tell applicants that they can avoid home visits by providing documentary evidence that is sufficient to confirm eligibility, and (3) schedule home visits with the household by designating a mutually agreeable date and "window of time" within which the County's agent will visit the home. The plaintiffs also argue that the Food Stamp regulations and Fourth and Fourteenth Amendments require the County to let applicants designate collateral contacts in the first instance. According to the plaintiffs, under the Food Stamp regulations and the Constitution the County can select collateral contacts on its own initiative only if those chosen by the applicant cannot reasonably be expected to provide accurate information.

The district court granted summary judgment for the plaintiffs with respect to almost every challenge they raised to the County's home visit and collateral contact procedures. More specifically, the court found that the federal regulations promulgated under the Food Stamp program required the County to inform applicants at the outset that home visits would not take place unless the County could not verify eligibility solely on the basis of documentary evidence. The court also prevented the County from making home visits unless documentary evidence was insufficient to confirm eligibility, and required the County to give applicants advance notice concerning the date of the home visit. Likewise, the Court found that the Food Stamp regulations required the County to let applicants designate collateral contacts in the first instance, and required the County to tell the applicant that collateral contacts would be consulted only if documentary evidence was insufficient to confirm eligibility. The court noted that in the case of joint applications for Food Stamps and AFDC, the Food Stamp regulations govern only the verification of facts unique to eligibility for food stamps ("food stamp only facts"). The court, however, also concluded that in the case of joint applications the Fourth and Fourteenth Amendment required the County to give advance notice as to the date of any warrantless home visit, to use home visits only with respect to matters that could not be effectively verified by other means, and to give applicants an opportunity to designate collateral contacts in the first instance. The court entered an injunction consistent with its opinion; both parties filed this interlocutory appeal.

## II. Analysis

Both parties challenge the district court's injunction. For the most part, the plaintiffs argue that the district court correctly interpreted the federal regulations governing the County's verification procedures. However, they argue that the Food Stamp regulations as well as the Fourth and Fourteenth Amendments require the County to set a "window of time" within which a home visit will take place. Also, on appeal they renew their alternative argument that the Fourth and Fourteenth Amendments impose the notice and scheduling requirements found in the district court's injunction. The gravamen of the County's appeal is the distinction drawn in the Food Stamp regulations between applications limited to the Food Stamp program (food stamp only applications) and joint applications for AFDC and Food Stamps (joint applications). As the County points out, in the case of joint applications the Food Stamp regulations only govern the

verification of factors unique to the determination of eligibility for food stamps. The district court recognized this, but then went on to hold that the Fourth and Fourteenth Amendments imposed restrictions almost identical to those created by the Food Stamp regulations on the County's efforts to verify the eligibility of persons filing joint applications. The County contests this holding.

### A. Claims for Violation of Federal Regulations

In this section, we consider those aspects of the plaintiffs' claims that rest upon the federal regulations governing the Food Stamp and AFDC programs. First, we consider the district court's interpretation of the Food Stamp regulations and the restrictions they impose on the County's verification procedures for food stamp only applications. Then we consider the operation of the Food Stamp regulations in the case of joint applications for AFDC and Food Stamps.

#### 1. Applications for food stamps only.

As the plaintiffs have indicated, the class includes applicants for or recipients of food stamps only, and at least one representative plaintiff (H.B.) received only food stamps. Therefore, we need to consider the operation of the Food Stamp regulations with respect to food stamp only applications. More specifically for the purposes of this interlocutory appeal, we need to consider the restrictions that those regulations impose on the County's home visit and collateral contact practices.

▮▮▮ As a preliminary matter, we consider the County's argument that the procedures at issue are exempt from the Food Stamp regulations because the investigations are performed under the state's Front End Verification Program ("FEV"). FEV is a program established pursuant to 7 U.S.C. § 2020(e)(23)'s dictate that states establish a unit for detection of fraud in the food stamp program. Basically, the County appears to argue that the Food Stamp regulations do not apply to its FEV program because the

FEV program is designed to reduce erroneous benefits determinations and fraud. We agree with the County that the Food Stamp regulations concerning the verification of applications do not apply to fraud detection or quality control programs undertaken pursuant to 7 U.S.C. § 2020(e)(2), 7 C.F.R. § 273.2(h), 275.10–14. See 7 C.F.R. Part 275 & Subpart C, §§ 275.10–14 (distinguishing between verification and quality "control programs," which entail full investigations of a statistical sampling of program participants). But here the defendants have admitted that the primary function of their FEV program is to ensure accurate verification. They also acknowledge that the FEV program, by its terms, concerns the application and recertification process, and the evidence of record indicates that the practices at issue are undertaken in connection with the verification of eligibility or recertification. Also, in several portions of their brief dealing with the plaintiffs' constitutional challenges, the defendants insist that their FEV program is not a criminal investigation. In short, the County has not, and apparently cannot, establish that its FEV program is merely a quality control or fraud detection program. Rather, the evidence establishes that the FEV program is used to verify eligibility for food stamps as defined in 7 C.F.R. § 273.2(f)(1) & (f)(8). Under these circumstances, we must conclude that the Food Stamp regulations govern the specific practices at issue, *when undertaken to certify or recertify eligibility for benefits under the Food Stamp program*, without regard for how they are categorized by the County.[3]

#### a. Home visits.

We now consider the restrictions that the Food Stamp regulations place upon the *verification procedures used by the County to certify or recertify eligibility for food stamps* that were enjoined by the district court, starting first with the use of home visits. The use of home visits to confirm an applicant's eligibility for food stamps is governed

---

**3.** To the extent that the County implements similar procedures for the investigation of fraud and not as part of the certification or recertification procedure, the Food Stamp regulations are inapplicable.

by 7 C.F.R. § 273.2(f)(4)(iii). That section provides that:

> Home visits may be used as verification only when documentary evidence is insufficient to make a firm determination of eligibility or benefit level, or cannot be obtained, and the home visit is scheduled in advance with the household.

■ Under the County's current procedures home visits are not limited to cases where documentary evidence is insufficient to make a firm determination of eligibility or where documentary evidence cannot be obtained. We therefore agree with the district court that the federal regulations require the County to avoid home visits unless those circumstances are present. But we also note that a "firm" determination of eligibility is necessarily one in which the County believes that the documentary evidence provided by the applicant is reliable, *see* 7 C.F.R. § 273.2(f)(4)(i), and that the regulations require the state to verify any information that is deemed questionable, *see* 7 C.F.R. § 273.2(f)(2)(i). Thus, in cases where the County finds the documentary evidence provided by the applicant insufficient to make a "firm" determination of eligibility, home visits may be conducted consistent with the regulations.

■ The district court also found that § 273.2(f)(4)(iii) required the County to inform applicants at the time they applied for benefits that there would be no home visit if documentary evidence was sufficient to confirm eligibility. We disagree. The regulations require the County to inform applicants about "the verification requirements the household must meet as part of the application process," 7 C.F.R. § 273.2(c)(5), and also require the County to inform applicants that the information they provide will be subject to verification. *See* 7 C.F.R. § 273.2(b)(1)(i) & (b)(2). Given these specific regulations which require the County to provide applicants with notice as to specific matters, we disagree that the regulations additionally require the County to tell applicants that they may be subject to a home visit if documentary evidence is insufficient to verify their eligibility. Where the regulations do require a specific type of notice, they describe the re-

quired notice in detail. *See e.g.* 7 C.F.R. § 273.2(b)(1) & (2).

■ The district court also found that Food Stamp regulations require the County to tell applicants in advance the date (but not the time) that the County will make a home visit. In pertinent part, those regulations provide that a home visit can only be used when it is "scheduled in advance with the household." 7 C.F.R. § 273.2(f)(4)(iii). The district court's interpretation of the term "scheduling" is certainly reasonable, and we accept it. On appeal, the plaintiffs again argue that the regulations require the County to designate a specific "window of time" within which the home visit will take place. The district court rejected this argument after taking judicial notice that the County was confronted with a tremendous caseload. Under these circumstances, the court concluded, requiring the County to provide advance notice of the time of day of the home visit would be an unreasonable interpretation of the regulations. Also, the district court noted that where the regulations required the County to specify the time of an interview, the regulations specifically said so. *See* 7 C.F.R. § 273.2(e)(2)(i). For these reasons, we agree that the regulations scheduling requirements obligate the County to provide advance notice of the date, but not the time of day, of home visits taken to certify or recertify eligibility for food stamps as defined in 7 C.F.R. § 273.2(f).

#### b. Collateral contacts.

Under the Food Stamp regulations, a "collateral contact" is "an oral confirmation of a household's circumstances by a person outside the household." 7 C.F.R. § 273.2(f)(4)(ii). The regulations provide that "[t]he State agency, generally, shall rely on the household to provide the name of any collateral contact." 7 C.F.R. § 273.2(f)(5)(ii). However, the regulations also provide that "[t]he state agency is not required to use a collateral contact designated by the household if the collateral contact cannot be expected to provide an accurate third-party verification" and the regulations note that the state agency is responsible for obtaining verification from acceptable collateral con-

tacts. *Id.* At present, the County does not allow applicants for food stamps to designate collateral contacts in the first instance. Of course, this means the County also does not limit its selection of collateral contacts to those cases where the collateral contacts designated by applicants are unacceptable under the Food Stamp regulations. Therefore, the district court enjoined the County from making collateral contacts on its own initiative, unless those designated by the applicant were unacceptable.

 We affirm the district court's interpretation of the regulations. The County must give Food Stamp applicants an opportunity to designate acceptable collateral contacts; it can select its own collateral contacts only if the applicant fails to designate contacts deemed satisfactory under the regulations. However, the district court also determined that applicants must be informed at the time of their application that collateral contacts will not be used unless documentary evidence cannot be obtained or what is obtained is insufficient to make a firm determination of eligibility. This is an added requirement not now written into the already voluminous regulatory procedures. Given the specific regulations governing the notice that the County must give applicants concerning verification, the district court's conclusion that the regulations require the County to give further notice goes beyond what is required by the regulations.

### 2. Joint applications.

 Households applying for both food stamps and public assistance are categorized as joint applications. At present, the vast majority of applications for public assistance are joint applications. But the County's policy does not distinguish between Food Stamp only applications and joint applications for AFDC. The district court found that in the case of joint applications for AFDC and food stamps, the Food Stamp regulations govern the County's verification procedures when it

is verifying eligibility criteria *unique to the Food Stamp program.* That conclusion is compelled by the plain language of the regulations:

> For households applying for both public assistance and food stamps, the verification procedures described [in the Food Stamp regulations] shall be followed for those factors of eligibility which are needed solely for the purposes of determining the household's eligibility for food stamps. For those factors of eligibility which are needed to determine both [Public Assistance] eligibility and food stamp eligibility, the State agency may use the [public assistance] verification rules ...

7 C.F.R. § 273.2(j)(1)(iii). *See also* 7 C.F.R. § 273.14(a)(4) (applying this formula to re-certification). The term "public assistance" is defined to include the AFDC program. 7 C.F.R. § 271.2. Therefore, as the district court concluded, in the case of joint applications for AFDC and food stamps, the restrictions on verification procedures created by the Food Stamp regulations govern only the verification of eligibility criteria unique to the Food Stamp program. The district court is correct. The County must comply with Food Stamp regulations only when verifying *criteria of eligibility unique to the Food Stamp program.*[4]

### B. Constitutional Claims

As noted, in Wisconsin most applicants fill out a joint application for food stamp and AFDC benefits. Thus, the restrictions imposed by the Food Stamp regulations have a fairly limited impact upon the County's verification operations. Before the district court, and on this interlocutory appeal, the plaintiffs argue that the County's current home visit policy employs warrantless searches that violate the Fourth and Fourteenth Amendments. The district court agreed. In doing so, the court distinguished *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), which held that the home visits in

---

4. On appeal, the plaintiffs claim for the first time that food stamp verification regulations apply to joint applicants by reason of 7 C.F.R. § 273.2(j)(2). It is true that the Food Stamp regulations are used to verify eligibility of joint applicants, but those regulations come into play

only after the applicant has been certified categorically eligible for public assistance pursuant to 7 C.F.R. § 273.2(j)(1). Since the certification for public assistance is made first, § 273.2(j)(2) is inapplicable to that determination. 7 C.F.R. § 273.2 at (j)(1)(iv).

that case were not searches within the meaning of the Fourth Amendment, and further, that if the home visits were considered to be searches, they were reasonable searches that did not violate the Fourth Amendment. After finding that the County's home visit policy violated the Fourth Amendment, the district court enjoined the County from conducting home visits unless (1) applicants were given advance notice of the date of the visit, (2) the visit was limited to verification of matters that could not be effectively verified by other means, and (3) the plaintiffs were given an opportunity to designate collateral contacts. On appeal, the County asserts that its home visit policy fits well within the reasoning of *Wyman, supra,* and therefore does not violate the Fourth and Fourteenth Amendments. Thus, in addition to the regulatory analysis, we need to consider whether Milwaukee's home visit policy violates the Fourth Amendment.

■ The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . ." and that prohibition binds the states. *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). It is well established that the Fourth Amendment protects a citizen's legitimate expectation of privacy in the "invaded place." *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). It is also well-established that "[a]s the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness,' . . . [and] [w]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interest." *Vernonia School District 47J v. Acton,* ― U.S. ――, ――, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995) (citations and internal quotations omitted).

The first question is whether the County's home visits are searches. In *Wyman, supra,* the Supreme Court held that home visits by a caseworker made pursuant to the administration of the AFDC program were not searches. The Court did so even though it acknowledged that the caseworker's visit had both a rehabilitative and investigative aspect. *Wyman,* 400 U.S. at 317, 91 S.Ct. at 385. The Court reasoned that the home visit, even given its investigative aspect, could not be "equated with a search in the traditional criminal law context." *Id.* In this regard it wrote:

> We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.

*Id.* at 317–18, 91 S.Ct. at 385–86.

■ We are bound by *Wyman.* In this case, as in *Wyman,* the County's policy provides that a field representative can enter an applicant's home only if the applicant consents. Indeed, the County's policy even requires the field worker to inform the applicant that she can withdraw her consent to the home visit at any time. The field representative's inquiries are limited to items in need of verification, and he can note only things in plain view or inspect areas of the house or examine closets and open doors if the occupant gives permission. In this case, as in *Wyman,* the applicant's refusal to consent to the home visit is not a criminal act, and benefits are not denied or cut off because the applicant has refused to allow the home visit. Therefore, *Wyman* dictates that the home visits at issue are not searches within the meaning of the Fourth Amendment.

■ As we see it, *Wyman* is an unexceptional application of the principle that the Fourth Amendment's "prohibition does not apply . . . to situations in which voluntary consent has been obtained. . . ." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). On appeal, the plaintiffs urge us to make a blanket ruling that any consent to a home visit given by a recipient of public aid is involuntary as a matter of law. This request defies the whole body of Fourth Amendment jurisprudence

which emphasizes that the voluntariness of consent is a question of fact to be decided in each case. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). The evidence of record also belies the plaintiffs' assertion for, as noted below, at least one of the five named plaintiffs, S.L., refused to allow the County's field representative to enter her house. On a later occasion when she reluctantly let him in, she refused him access to part of the house. The plaintiffs also argue that any consent given by the recipients of public assistance is coerced because the County has conditioned the receipt of public aid on the relinquishment of Fourth Amendment rights. We find no such evidence in the record. In fact the record shows that the County's current policy prohibits field representatives from telling applicants that their benefits will be cut off if they do not allow the home visit. While it is true that benefits may be withheld or withdrawn if an applicant does not allow the home visit, this follows from the County's inability to verify the applicant's eligibility, not from the applicant's refusal to allow a home search. There is no evidence or reason to believe that an applicant who declines the home visit will be denied benefits even if satisfactory verification of eligibility is provided by some other means.

As in *Wyman, supra,* the home visits at issue, even if they are considered searches within the meaning of the Fourth Amendment, are reasonable searches that do not violate the Constitution. In *Wyman,* the Supreme Court held that the home visit at issue in that case was justified because of the important state interests furthered by the home visit. Although some of those factors related to the caseworker's duty to ensure the health and safety of children receiving AFDC benefits, many of the considerations emphasized by the Court apply in this case.

In *Wyman, supra,* the Court emphasized that the agency conducting the home visit was fulfilling a public trust, and that the state had "appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of the tax-produced assistance are the ones who benefit from the aid it dispenses." *Id.* at 319, 91 S.Ct. at 386. Likewise, the court noted that the state had an important interest in seeing that the funds received by the household were expended for their intended purpose. *Id.* The record shows that these same interests are also present in this case. For example, when the County's field representative attempted verification with respect to S.L.'s case, he was told that S.L. gave all of her AFDC checks and food stamps to another individual who deprived S.L. of all her benefits. During a later investigation, S.L.'s door was opened at about 9:30 a.m. by an adult male in his pajama bottoms; he immediately shut the door in the field representative's face. A few minutes later, S.L. opened the door in her nightgown, but she refused to provide any form of identification for her children, and refused to let the field representative see if they were actually living in the home. S.L. also refused to identify the adult male who had opened the door, and eventually ordered the field representative to leave the house, slamming the door behind him. Later, the building manager told the field representative that an adult male was living in the home with S.L. Similarly, in the case of B.S., who also received AFDC benefits, at least two individuals told the County's field representative that she had been living with her husband for at least 3 and 9 years respectively. Needless to say, during at least some of this period B.S. was receiving public assistance.[5]

We note these facts not because we have any interest in trivializing the social, moral, and economic difficulties that the recipients of public assistance must confront, but rather to illustrate that the state as well as the recipient and the caseworker "not only [have] an interest but an obligation" to ensure proper use of funds entrusted from the public. *Wyman,* 400 U.S. at 319, 91 S.Ct. at 386. All of the facts we have mentioned are relevant

---

5. It is true that in these cases, both S.L. and B.S. were able to convince the County that they were actually eligible for public assistance. But that does not change the fact that the County had good reasons to believe that neither applicant was eligible for benefits until additional information was provided.

to determining eligibility for AFDC. *See generally,* 45 C.F.R. Part 233; 45 C.F.R. § 233.10(b)(2)(ii)(a)(2) (describing "needy children" as those "deprived of parental support by reason, [*inter alia* ], of the ... continued absence from the home ... of a principal earner"); 233.90 (describing factors specific to AFDC benefits, including status as a "needy child"). S.L. and B.S. are two of the only five named plaintiffs in this case. We think it fair to say that their eligibility could be questioned by the County in good faith.

In *Wyman, supra,* the Supreme Court emphasized several other features of the home visit which contributed to its holding that the home visits were reasonable. For one thing, the Court noted that the recipient had received several days' advance notice of the intended home visit. *Id.* at 320, 91 S.Ct. at 387. Also, the Court emphasized that the program at issue was sensitive to privacy because it made the applicant the primary source of information concerning eligibility, and limited the contact of collateral sources to those designated by the applicant. *Id.* at 321, 91 S.Ct. at 387.

■ While not all these factors are present in this case, the County's current policy does approximate these features. Currently, the County gives the applicant notice that his home will be visited in the next 10 days. Although the date is not specified, it is also true that an applicant is not penalized if the County's field representative is unable to reach him. Indeed, the record shows that the County's field representatives frequently have to make several trips before they can make contact with the applicant. Also, here as in *Wyman,* the visit takes place during normal business hours, although under the County's policy special circumstances can justify a home visit sometime between 8:00 a.m. and 8:00 p.m. The County's current policy forbids field representatives from telling collateral contacts that the applicant receives public assistance. Also, to the extent the County verifies information by the home visit, it will not have to verify that information from other sources.

Other factors which led the Court to conclude that the home visit in *Wyman* was reasonable are also present in this case. For example, in *Wyman,* the Court emphasized that the visit at issue was not made by police or uniformed authority. Nor was it a criminal investigation or made in aid of any criminal proceeding. The Court also noted that "[i]f the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect." *Id.* at 323, 91 S.Ct. at 389. As we have already noted, the practices at issue were not criminal investigations. Rather, the purpose of these home visits was to verify an applicant's eligibility for public assistance consistent with the public trust.

For this reason, in *Wyman* the Supreme Court rejected the argument, made by the plaintiffs in this case, that warrantless searches were unreasonable. The Court concluded that the warrant requirement was out of place in the welfare context where a showing of probable cause might unnecessarily limit searches that were otherwise reasonable, or, more significantly, might encourage searches that were unnecessarily intrusive. *Id.* at 323–24, 91 S.Ct. at 388–89. Put another way, the Court implicitly acknowledged that "the probable-cause standard is peculiarly related to criminal investigations." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 667, 109 S.Ct. 1384, 1391, 103 L.Ed.2d 685 (1989); *see also Vernonia,* — U.S. at — – —, 115 S.Ct. at 2390–91. Likewise, in *Wyman,* the Supreme Court rejected another argument made in this case: that all necessary information could be obtained by some other means. *Id.* at 322, 91 S.Ct. at 388. The Court noted that other forms of confirmation could not always assure actual residence and actual physical presence in the house, which are requirements of the AFDC program. *Id.* As described above, the verification investigations in this case show that these concerns are present here. In the cases of S.L. and B.S., at least, the information obtained by the investigators indicated that benefits might have been given in error.

As in *Wyman,* what the plaintiffs here "appear to want from the agency that provides ... [them and their children] with the necessities for life is the right to receive

those necessities upon ... [their] own informational terms, to utilize the Fourth Amendment as a wedge for imposing those terms, and to avoid questions of any kind." *Id.* at 321–22, 91 S.Ct. at 387–88. Indeed, we think that *Wyman* is nothing more than a concrete application of the well-established principle that "the legitimacy of certain privacy expectations *vis-a-vis* the State may depend upon the individual's relationship with the State." *Vernonia,* —— U.S. at ——, 115 S.Ct. at 2391. In *Vernonia,* for example, the Supreme Court held that student athletes had a reduced expectation of privacy because "[s]omewhat like adults who choose to participate in 'closely regulated industry,' students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." *Id.* at ——, 115 S.Ct. at 2393. In *Wyman,* the Supreme Court applied this truism in the case of welfare recipients, as it had in a variety of other contexts. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (government employees); *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (probationers); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (reasonable inspection of private home to check for violations of municipal code); *Lesser v. Espy,* 34 F.3d 1301 (7th Cir.1994) (closely regulated industry). As in *Wyman, supra,* the home visits at issue are reasonable intrusions upon an applicant's privacy at least in part because the state has an "appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of the tax-produced assistance are the ones who benefit from the aid it dispenses." *Id.* at 319, 91 S.Ct. at 386.

We reach this conclusion notwithstanding that in *Wyman* the home visits were preceded by notice of the specific day of the visit and collateral contacts were identified by the applicants, where here the County's current policy is to provide notice that the visit will occur within the next 10 days and collateral contacts are made without the applicant identifying those contacts. These differences represent only one of the eleven factors *Wyman* enumerated as supporting its conclusion that even if home visits were labeled searches, they were reasonable searches. The strength of the remaining ten factors leads us to conclude that home visits conducted pursuant to the County's current policy, even if considered searches, are reasonable.[6] The reasonableness of this policy is underscored when one considers the practical limitations for the County as well as the applicant on providing notice of the specific day of the visit. As the record evidences, often applicants are not there on the day the County attempts to conduct the home visit. Or the County worker may be unable to complete all of the scheduled home visits because others set for that day take longer than expected. Under a requirement that notice of the specific day be given, new notice— even for a visit the following day—would be required. Not only would this prove to be expensive and burdensome to the County, but in the end the applicant could be the one to suffer, either by being required to be at home for the scheduled visit, or by a delay in the verification process and a corresponding delay in receiving benefits. Additionally, since the County does not allow the applicant to name collateral contacts, the home visits increase in importance.[7] At any rate, like the Supreme Court in *Wyman,* we hold that home visits authorized by the County's current policy are reasonable, and therefore do not violate the Fourth Amendment. We

---

**6.** Moreover, while the notice at issue in *Wyman* actually stated the specific date upon which the visit would take place, the Court also acknowledged that the record showed that caseworkers often came without notice. *Id.* at 320 n. 8, 91 S.Ct. at 387 n. 8.

**7.** In *Wyman* the plaintiffs were allowed to name collateral contacts and here the plaintiffs claim that that was a constitutional right based on the Fourth and Fourteenth Amendment's prohibition

of unreasonable searches and seizures. The *Wyman* court, however, did not say that individuals had a constitutional right to name collateral contacts and we do not see how it could be, since plaintiffs clearly have no Fourth Amendment standing to object to contacts made of third parties. *Rakas v. Illinois,* 439 U.S. 128, 133, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978) (rights guaranteed by the Fourth Amendment are personal, and may not be asserted vicariously).

would nevertheless encourage the County to set target days and times to accommodate the best use of government resources and the most efficient delivery of services.

■ The plaintiffs also claim that the Fourteenth Amendment guarantee of due process of law requires the County to inform applicants of "their right to prevent home visits." In this regard, they argue that the Food Stamp regulations create a liberty interest to prohibit home visits unless documentary evidence is insufficient to confirm eligibility, and that due process requires the County to give applicants notice that they can prevent home visits by providing adequate documentation. Even assuming that the Food Stamp regulations create some protected "liberty" interest, the requirements of due process are met in this case. The Food Stamp regulations require the County to provide the applicant with "a notice that informs the household of the verification requirements the household must meet as part of the application process," and provides that "[a]t a minimum, the notice shall contain examples of the types of documents the household should provide and explain the period of time the documents should cover." 7 C.F.R. § 273.2(c)(5). In addition, if documentary evidence is insufficient to confirm an applicant's eligibility for food stamps, under the County's current policy the applicant receives a notice that her home will be visited in the next 10 days. The County's "Notice of Field Verification" states the reason(s) for the field verification, and provides applicants with telephone numbers so they can reach representatives of the County's FEV unit.[8] This process gives Food Stamp applicants notice of an impending home visit and an opportunity to contact the FEV so that they can protest the home visit and provide additional documentation needed to confirm eligibility. This is all the process that is due.[9]

### III. Conclusion

The Food Stamp regulations place specific restrictions on the procedures that states can

use to certify and recertify applicants' eligibility for food stamps. These restrictions limit home visits to situations where the documentary evidence is insufficient to make a firm determination of eligibility or benefit level, or where such documentary evidence cannot be obtained. The Food Stamp regulations also require states to notify the applicant of the date the home visit will take place, although the applicant need not be informed of the time of day of the visit. Additionally, the Food Stamp regulations dictate that states allow Food Stamp applicants to specify the names of collateral contacts, and states must use those named individuals unless they cannot be expected to provide an accurate third-party verification. The regulations do not require notice to the applicants that collateral contacts and home visit procedures will not be used if documentary evidence is sufficient. Nor is such notice required by the Fourth and Fourteenth Amendments' prohibition on unreasonable searches and seizures or due process clauses.

The Food Stamp regulations, however, do not apply to certification and recertification of public assistance, including AFDC applications. And where the application is a joint application, the Food Stamp regulations apply only to the verification of those criteria unique to the Food Stamp programs. The County's current procedures for home visits and collateral contacts for verification of AFDC applications, or the AFDC portion of joint applications, are therefore not prohibited by the Food Stamps federal regulation.

The Fourth Amendment's prohibition on unreasonable searches and seizures, as incorporated by the Fourteenth Amendment, also does not prohibit the County's current home visit and collateral contact verification procedures because such procedures do not constitute "searches," and even if they did, they are entirely reasonable. Nor does due process require more specific notice.

For these and the foregoing reasons, we affirm in part, reverse in part, and remand

8. The notice is set forth in Appendix A.

9. Pursuant to today's decision, in scheduling home visits for food stamp applicants, the County will have to conform to federal regulations by

giving notice of the day of the home visit. That is required by federal regulations, however, and not the Constitution.

**1312**

with instructions for the district court to enter an injunction consistent with this opinion.

## APPENDIX A

### NOTICE OF FIELD VERIFICATION

Name: _____ Date: _____

Address: _____ SSN: _____

_____ IM: _____

Dear Participant:

This notice is to inform you that your case will have a field verification by the Wisconsin Department of Social Services–Milwaukee Branch. A field representative may come to your home within the next ten (10) working days.

REASON(S) FOR FIELD VERIFICATION

____ UNREPORTED INCOME ____ VEHICLES

____ HOUSEHOLD COMPOSITION ____ ASSETS

____ RENT/SHARED EXPENSES ____ UNABLE TO LOCATE

____ SPOUSE/ABSENT PARENT IN HH ____ OTHER:

____ RESIDENCY

ALL FIELD REPRESENTATIVES OF THIS DEPARTMENT ARE REQUIRED TO SHOW PROPER IDENTIFICATION.

If you have any questions regarding this matter, you may contact the Front End Verification Unit at 289–6187 or 289–5799.