FISHER, Circuit Judge,
dissenting:
I cannot agree with the majority’s conclusion that Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), *932 “directly controls” our resolution of this case. See Maj. Op. at 921. Unlike the case before us, Wyman involved a primarily rehabilitative home visit by a social assistance caseworker “whose primary objective [was], or should [have been], the welfare, not the prosecution, of the aid recipient for whom the worker [had] profound responsibility.” 400 U.S. at 323-24, 91 S.Ct. 381. That is a far cry from the program carried out by the County of San Diego, whose Project 100% home visits entail a law enforcement agent — trained not to give advice to welfare applicants— walking through the applicant’s home in search of physical evidence of ineligibility that could lead to criminal prosecution either for welfare fraud or other crimes unrelated to the welfare application. In light of the significant differences in scope and implementation between the home visits at issue in Wyman and those challenged here, I disagree with the majority’s conclusion that the home visits do not rise to the level of a Fourth Amendment search.
Nor do I agree with the majority’s improper discounting of the Appellants’ heightened privacy interest in their home. In the majority’s view, even if the home visit is a search, it is reasonable because the Appellants’ relationship with the state as potential welfare recipients “reduce[s] the expectation of privacy even within the sanctity of the home.” Maj. Op. at 927. To support this conclusion, the majority relies on Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), a case that upheld the constitutionality of a warrantless search of a probationer’s home. By suggesting that welfare applicants may be treated the same as convicted criminals, the majority ignores the limits implicit — and explicit — in Griffin.
The Project 100% home visits constitute searches because they violate “a subjective expectation of privacy [in the home] that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Even assuming the County’s need to verify eligibility and prevent fraud, that legitimate need is not “important enough to override the [welfare applicant’s] acknowledged privacy interest” in the home nor “sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion.” Chandler v. Miller, 520 U.S. 305, 318, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). The visits as implemented are unreasonable searches under the Fourth Amendment and Article I § 13 of the California Constitution. They also violate the Appellants’ right to privacy and the unconstitutional conditions doctrine under California law. I respectfully dissent.
I.
It is well established that the Fourth Amendment protects a citizen’s “legitimate expectation of privacy in the invaded place.” Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). “As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is ‘reasonableness,’ .... [and] whether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Vernonia School District 47J v. Acton, 515 U.S. 646, 652-53, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citations and internal quotations omitted). Thus, the first question is whether the County’s home visits are searches.
In Wyman, the Supreme Court held that a primarily rehabilitative home visit *933 by a New York social assistance caseworker did not constitute a search for purposes of the Fourth Amendment. 400 U.S. at 317-18, 91 S.Ct. 381. The Court further held that even if the visit were a search, it “[did] not fall within the Fourth Amendment’s proscription” because it was reasonable. Id. at 318, 91 S.Ct. 381. Several aspects of New York’s home visit program — absent in Project 100% — persuaded the Court to reach these conclusions, and the majority too readily dismisses the fundamental differences between the two programs when it holds that Wyman “directly controls” this case. Maj. Op. at 921.
As an initial matter, the majority reads Wyman’s narrow holding too broadly. Wyman did not create a blanket rule that “home visits for welfare verification purposes are not searches under the Fourth Amendment.” See Maj. Op. at 920. Rather, Wyman’s holding was specific to the facts before it:
We therefore conclude that the home visitation as structured by the New York statutes and regulations is a reasonable administrative tool; that it serves a valid and proper administrative purpose for the dispensation of the AFDC program; that it is not an unwarranted invasion of personal privacy; and that it violates no right guaranteed by the Fourth Amendment.
Wyman, 400 U.S. at 326, 91 S.Ct. 381 (emphasis added). Indeed, the Court explicitly left open the possibility that home visits, such as the one before us today, might run afoul of Fourth Amendment principles: “Our holding today does not mean, of course, that a termination of benefits upon refusal of a home visit is to be upheld against constitutional challenge under all conceivable circumstances.” Id. With this more proper understanding of Wyman’s holding in mind, I do not believe we are bound to hold that the Project 100% home visits are not searches.
First, as the majority recognizes, Wy-man emphasized that although the caseworker visits were “both rehabilitative and investigative,” id. at 317, 91 S.Ct. 381, the investigative aspect “did not rise to the level of a ‘search in the traditional criminal law context.’ ” Maj. Op. at 921 (quoting Wyman, 400 U.S. at 317, 91 S.Ct. 381). In effect, the Court concluded that the New York home visit was primarily rehabilitative. See Wyman, 400 U.S. at 323, 91 S.Ct. 381 (explaining that “the program concerns dependent children and the needy families of those children. It does not deal with crime or with the actual or suspected perpetrators of crime. The caseworker is not a sleuth but rather, we trust, is & friend to one in need.”) (emphasis added). The Court also found significant that “snooping in the home [is] forbidden.” Id. at 321, 91 S.Ct. 381.
In concluding that Wyman binds us, the majority notes that the caseworker visits there, like the Project 100% visits, were conducted with the applicant’s consent, and that the only penalty for refusing consent is the denial of benefits. Maj. Op. at 921 - 923. At the same time, the majority correctly recognizes that the Project 100% home visits are made not by social workers but by district attorney fraud investigators. Maj. Op. at 921-922, 923-924. However, the majority concludes that this difference “does not cause the home visits to rise to the level of a ‘search in the traditional criminal law context’ because the visits’ underlying purpose remains the determination of welfare eligibility.” Maj. Op. at 922 (quoting Wyman, 400 U.S. at 317, 91 S.Ct. 381); see also id. at 923 - 924. In addition, the majority dismisses the Appellants’ claims of snooping because the investigators “ask to view the contents of closets or drawers for verification-related *934 purposes, and will do so only with the homeowner’s explicit consent.” Maj. Op. at 924 - 925 n. 13.
I find the majority’s analysis troubling in several respects. To begin, the majority admittedly draws a “fine line” between searches to determine eligibility and those aimed at investigating fraud. See Maj. Op. at 926. In practice, the distinction is one without a difference. In verifying eligibility, fraud investigators — as their job title suggests — necessarily are investigating potential fraud through their enforcement of welfare laws and regulations. Indeed, unlike in Wyman, the investigators testified that as peace officers they have a duty to — and do — look for and report evidence of crimes.[1] [See, e.g., ER 85, Ex.l4:76, Ex. 1:169, Ex. 8:42-43] Thus, we do not, as the majority suggests, deal here with a visitation that “serves to discourage misrepresentation or fraud” as a mere “byproduct of that visit,” as was the case in Wyman. See Maj. Op. at 924 n. 12 (quoting Wyman, 400 U.S. at 323, 91 S.Ct. 381) (emphasis added).
At the same time, the majority overlooks a key distinction between the New York home visits and those carried out by the County of San Diego, namely, that the Project 100% home visits have only a minimal, if any, rehabilitative function. The record reveals that the program is operated exclusively by the District Attorney’s Public Assistance Fraud Division, which is the County’s Special Investigative Unit (SIU), as an “early fraud prevention and detection program;” the County’s welfare agency does not exercise any supervisory responsibility over the program. [ER 85, Ex. 14:156 (Reid Depo) ]. Thus, whereas in Wyman the home visits were conducted by social workers who had “profound responsibility” for the aid recipient, Wyman, 400 U.S. at 323, 91 S.Ct. 381, here the visits are conducted by agents of the district attorney charged only with verifying welfare eligibility and detecting fraud using investigative techniques.[2] [ER 85, Ex. *935 5,7,8,9,14] Unlike in Wyman, these fraud investigators do not interview the applicant inside the home to discuss “any changes in [the applicant’s] situation that might affect her eligibility ... [or] the amount of [her] assistance, and [whether] there are any social services which the Department of Social Services can provide to the family.” Wyman, 400 U.S. at 314, 91 S.Ct. 381 (quoting a letter from the New York City Department of Social Services describing the home visit’s “purpose”). Quite the contrary, the County’s fraud investigators are trained not to give advice to applicants because their focus is “highly limited” to legal compliance.[3] [ER 85, Ex.l:170] According to the defendants themselves, the program’s objective is not to assist the needy, but to “increase welfare fraud prevention efforts and to increase program integrity.”[4] [ER 86, Ex. 48:14 (Answer 64) ] Thus, that the fraud investigators are not exclusively engaged in a criminal investigation does not alter an important purpose of the home visits, which is to investigate and detect welfare fraud.[5]
Indeed, Wyman concluded that New York’s home visit was not “in aid of any criminal proceeding” in part because it viewed the possibility of the caseworker visit leading to the discovery of fraud and a subsequent criminal prosecution as purely speculative. 400 U.S. at 323, 91 S.Ct. *936 381 (explaining that “if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow, then ... that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct”). Of course, Project 100% is not a program in which there is some remote “chance” that a caseworker trying to help a needy applicant will stumble upon evidence of criminal activity. Instead, the County’s program requires fraud investigators with no expertise in social work and no object of rehabilitating the applicant to detect and report evidence of welfare fraud and other crimes. Inexplicably, the majority sees little difference between the two. Indeed, despite acknowledging that fraud investigators “do make referrals for criminal investigation,” Maj. Op. at 919 n. 3, the majority curiously concludes that the visits are nonetheless “intended, and in fact used, only as an eligibility verification tool.” Maj. Op. at 924 n. 12 (emphasis added). The County’s assertion to the contrary — which the majority itself accepts — belies any such conclusion.[6]
Finally, it is far from clear that Project 100% forbids “snooping,” as was the case in Wyman, 400 U.S. at 321, 91 S.Ct. 381. When walking through the welfare applicant’s home, a fraud investigator may request to look at the contents of bedrooms, closets, kitchens, bathrooms, medicine cabinets and drawers in search of evidence of ineligibility or fraud. The majority reasons that because consent is required, the investigator’s activity “cannot fairly be characterized as ‘snooping.’ ” Maj. Op. at 924 - 925 n. 13. But obtaining consent to snoop cannot change the nature of the ensuing conduct — snooping—any more than obtaining consent to search changes the nature of the search that follows. The question is whether looking in medicine cabinets, laundry baskets, closets and drawers for evidence of welfare fraud— even with consent — constitutes snooping. I doubt my colleagues in the majority would disagree that an IRS auditor’s asking to look in such places within their own homes to verify the number of dependents living at home would constitute snooping.
Far from having “direct application,” Maj. Op. at 922 n. 8, Wyman is factually distinguishable from the case at bar, and does not preclude our holding that the home visits carried out by the County of San Diego are unreasonable searches under the Fourth Amendment.[7]
*937 II.
The Supreme Court has long held that a “Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo, 583 U.S. at 33, 121 S.Ct. 2038 (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).[8] “This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes.” Burger, 482 U.S. at 699, 107 S.Ct. 2636 (emphasis added). Of course, this focus on subjective expectations might lead one to conclude that a welfare applicant destroys any such privacy expectation when she seeks aid from the government that is conditioned upon a home visit. See also United States v. Scott, 450 F.3d 863, 867 (9th Cir.2006). But as we made clear in Scott:
the Supreme Court has resisted this logic, recognizing the slippery-slope potential of the Katz doctrine:
“If the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes ... In such circumstances, where an individual’s subjective expectations had been ‘conditioned’ by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a ‘legitimate expectation of privacy’ existed in such cases, a normative inquiry would be proper.”
Id. (quoting Smith v. Maryland, 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). Here, we must decide whether welfare applicants continue to have a legitimate expectation of privacy in their homes even after consenting to a home visit. The answer to that question necessarily re *938 quires that we examine whether the home visit was a reasonable search.
We explained in Scott that assent to a search “is merely a relevant factor in determining how strong [the individuars] expectation of privacy is.” Id. at *9. Indeed, we have held that even convicted criminals — a group more readily subject to restrictions than welfare applicants — “do not waive their Fourth Amendment rights by agreeing, as a condition of probation, to ‘submit [their] person and property to search at any time upon request by a law enforcement officer.’ ” Id. at *10 (quoting United States v. Consuelo-Gonzalez, 521 F.2d 259, 261 (9th Cir.1975) (en banc)). Thus, the applicant’s consent to the home visit is valid only if, taking the fact of consent into account, the visit was a reasonable search. Id.
The majority concludes that the Project 100% home visits, even if considered searches, were reasonable under both the Supreme Court’s decision in Wyman and its subsequent line of “special needs” cases. Respectfully, I disagree. Neither Wyman nor the special needs doctrine renders constitutional the entry and inspection of homes under Project 100% by agents of the district attorney without warrants, probable cause or individualized suspicion of ineligibility or fraud.
A.
In holding that the Project 100% home visits are reasonable, the majority observes that, as in Wyman, they occur with advance notice, the applicant’s consent and serve the “important governmental interests of verifying an applicant’s eligibility for welfare benefits and preventing fraud.” Maj. Op. at 923.[9] But even assuming that the County adequately apprises the applicants of the scope of the walk-through, the similarities between the two programs end there.[10]
The visits in Wyman were designed primarily to promote recipients’ “personal, rehabilitative orientation.” 400 U.S. at 320, 91 S.Ct. 381. The Court emphasized that the visits did not focus on ferreting out ineligible recipients, but rather on “restoring the aid recipient ‘to a condition of self-support,’ and [on] the relief of his distress.” Id. at 319, 91 S.Ct. 381. By contrast, Project 100% is exclusively concerned with fraud and legal compliance and thus employs agents of the district attorney to conduct walk-through inspections of all applicants’ homes in search of evidence of ineligibility, fraud and other crimes.
The majority’s holding extends Wyman to a radically different set of facts. If the Project 100% home visits are constitutional, it is only because they are justified *939 under the special needs doctrine, and in my view, they are not.
B.
The Supreme Court has relaxed the Fourth Amendment’s warrant requirement “when ‘special needs, beyond the normal need for law enforcement,’ make [it] impracticable.” Griffin, 483 U.S. at 873, 107 S.Ct. 3164 (quoting New Jersey v. T.L.O., 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring in the judgment)) (emphasis added). The special needs cases make clear that courts must focus on the “primary” or “ultimate” purposes of the search in question to determine whether the purported need is beyond the normal need for law enforcement. See, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 38, 41, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating a roadside checkpoint program aimed at enforcing drug laws through drug-sniffing dogs and visual inspection of cars, because its “primary purpose was to detect evidence of ordinary criminal wrongdoing”); Ferguson v. City of Charleston, 532 U.S. 67, 81, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (invalidating a state hospital’s practice of testing pregnant women for cocaine and providing the results to the police, because the “ultimate purpose” of the testing program — the “beneficent” goal of “protecting the health of both mother and child” — “ ‘is ultimately indistinguishable from the general interest in crime control.’ ” (quoting Edmond, 531 U.S. at 44, 121 S.Ct. 447)). Thus, where the Court has upheld suspicionless drug testing programs, it has concluded that “the ‘special need’ ... was one divorced from the State’s general interest in law enforcement.” Ferguson, 532 U.S. at 79, 121 S.Ct. 1281; see also Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding the drug testing of railroad personnel involved in train accidents to ensure public safety); Nat’l Treasury Employees Union v. Von Raab, 489 U.S. 656, 670, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding the drug testing of federal customs officers who carry arms or are involved in drug interdiction to ensure that they “are physically fit, and have unimpeachable integrity and judgment”); Vernonia, 515 U.S. at 664-65, 115 S.Ct. 2386 (upholding the drug testing of high school student athletes to prevent drug addiction among students and maintain order in schools).
Assuming that the County’s need to verify eligibility and prevent welfare fraud is the primary purpose of the Project 100% home visit, I agree with the majority that the County has articulated a valid “special need” beyond ordinary law enforcement concerns. Cf. Scott, 450 F.3d at 870 (explaining that the government’s need to ensure that pre-trial releasees appear in court “implicates the efficient functioning and integrity of the judicial system,” which is “a purpose separate from the general interest in crime control”). The question is whether the County’s need is “important enough to override the [welfare applicant’s] acknowledged privacy interest” in the home and “sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion.” Chandler, 520 U.S. at 318, 117 S.Ct. 1295. To balance the home visit’s intrusion on the applicant’s Fourth Amendment interests against its promotion of legitimate governmental interests, we must consider: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion; and (3) the importance of the government interest at stake and the efficacy of the policy in meeting it. See Bd. of Educ. v. Earls, 536 U.S. 822, 830-34, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).
*940 In this ease, the nature of the privacy interest is at its “zenith,” Scott, 450 F.3d at 871, because the search involves the home, and warrantless searches of the home are “presumptively unreasonable.” Payton, 445 U.S. at 586, 100 S.Ct. 1371; see also Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (“With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.”). Although the majority acknowledges that the Appellants’ privacy interest is “significant,” it explains that “a person’s relationship with the state can reduce [the] expectation of privacy even within the sanctity of the home.” Maj. Op. at 927. To support this conclusion and thereby circumvent the presumption of unreasonableness, the majority again erroneously relies on Griffin.
Griffin held that a state’s operation of its probation system was a special need that justified the warrantless search of a probationer’s home. Importantly, Griffin noted that “[probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.” 483 U.S. at 874, 107 S.Ct. 3164 (internal quotation marks and citation omitted). The Court then explained that as convicted criminals, probationers “do not enjoy the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.” Id. (internal quotation marks and citation omitted). Griffin’s status as a felon on probationary release played a crucial part in the Court’s decision to permit the warrantless home search at issue there:
These restrictions are meant to assure that the probation serves as a
period of genuine rehabilitation and that the community is not harmed by the probationer’s being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed.... Supervision, then, is a “special need” of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large.
Id. at 875, 107 S.Ct. 3164 (internal citation omitted) (emphasis added). In Ferguson, the Supreme Court confirmed that “Griffin is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large.” 532 U.S. at 79-80 n. 15, 121 S.Ct. 1281.
Of course, unlike convicted felons, welfare applicants have no lesser expectation of privacy in their homes than the rest of us. See also Scott, 450 F.3d at 872 (distinguishing Griffin in a case involving warrantless drug testing of pre-trial re-leasees, because in contrast to probationers, “[p]eople released pending trial ... have suffered no judicial abridgment of their constitutional rights”). In this case, the Appellants have committed no wrong and the defendants have all but disclaimed any rehabilitative or supervisory purpose in Project 100%. See Vernonia, 515 U.S. at 654, 115 S.Ct. 2386 (confirming that it is the “supervisory relationship between probationer and State [that] justifies ‘a degree of impingement upon [a probationer’s] privacy that would not be constitutional if applied to the public at large’ ”) (quoting Griffin, 483 U.S. at 875, 107 S.Ct. 3164). Griffin, standing alone, does not provide a basis to conclude that welfare applicants have a reduced expectation of privacy because of their relationship with the state.[11]
*941 Nor do the Supreme Court’s more recent cases lend themselves to such a conclusion. Vemonia, for example, held that student athletes have reduced privacy expectations because of the schools’ “custodial and tutelary responsibility for children,” the “element of communal undress inherent in athletic participation” and because student athletes “voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally.” 515 U.S. at 656-57, 115 S.Ct. 2386 (internal quotation marks and citations omitted). Although the Court cited Griffin when it stated that “the legitimacy of certain privacy expectations vis-á-vis the State may depend upon the individual’s legal relationship with the State,” Vernonia, 515 U.S. at 654, 115 S.Ct. 2386 (emphasis added), it also emphasized that “the fact that the [students] are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster” was “[c]entral” to its holding. Id. Whatever legal relationship exists between the fraud investigator and the welfare applicant is wholly distinguishable from the relationship between a student and school administrators, id. at 656-57, 115 S.Ct. 2386, a probationer and his probation officer, Griffin, 483 U.S. at 874-75, 107 S.Ct. 3164, or the government as employer and its employees, Von Raab, 489 U.S. at 670-71, 109 S.Ct. 1384. Moreover, Vemonia confirmed that the legitimacy of a person’s subjective expectation of privacy “varies ... with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car or in a public park.” 515 U.S. at 654, 115 S.Ct. 2386.
With the exception of convicted felons, neither we nor the Supreme Court has ever held that an individual’s privacy expectation in the home was reduced to a level of unreasonableness as a result of their relationship with the state. But the majority today concludes that “it is reasonable for welfare applicants who desire direct cash governmental aid to undergo eligibility verification through home visits.” Maj. Op. at 927. Even if that broad statement is true, it does not follow that it is reasonable for a fraud investigator to conduct an intrusive walk-through of the home and look through its most private locations in search of evidence of welfare fraud, particularly if the applicant had no knowledge of the scope of the visit in the first place. I do not disagree that the Fourth Amendment permits some degree of intrusion in the home to verify welfare eligibility, so long as it is truly comparable to the limited home visit interview program at issue in Wyman. But walk-throughs and fraud investigations of the sort conducted here far exceed what is permissible. Society, I should think, is willing to recognize as reasonable a welfare applicant’s privacy expectation that the most intimate locations of the home will be free from the government’s prying eyes, even when he or she consents to a vaguely described home visit to “verify” or “check” information provided in an application for welfare benefits. See Kyllo, 533 U.S. at 27, 121 S.Ct. 2038. Thus, notwithstanding the welfare applicant’s need for government aid, his or her relationship with the state falls far short of reducing the expectation of privacy in the home.[12] *942 See also Scott, 450 F.3d at 872 (distinguishing Griffin to hold that to the extent a pre-trial releasee’s assent to warrantless searches “decreased his reasonable expectation of privacy ... the decrease was insufficient to eliminate his expectation of privacy in his home”).
The majority next concludes that the intrusion on privacy is also “reduced” as a result of the procedures used in conducting the home visit and because the applicant must consent to it. Of course, the cost to the applicant of refusing consent is a denial of welfare benefits, and we have rejected the notion that the waiver of constitutional rights in exchange for government benefits is always permissible. Scott, 450 F.3d at 866 (stating that “our constitutional law has not adopted this philosophy wholesale”). The “unconstitutional conditions” doctrine limits the government’s ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary:
[Wje live in an age when government influence and control are pervasive in many aspects of our daily lives. Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections. Where a constitutional right “functions to preserve spheres of autonomy ... [Unconstitutional conditions doctrine protects that [sphere] by preventing governmental end-runs around the barriers to direct commands.”
Id. (quoting Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L.Rev. 1413, 1492 (1989)).[13] The question here is whether the applicant’s option to withdraw his or her consent and terminate the visit permissibly serves to reduce the nature of the intrusion on the applicant’s privacy.
In the context of welfare benefits, where government aid is an important means of providing food, shelter and clothing to a family, the coercive nature of the home visit renders the notion of consent effectively meaningless. Although Wyman stated that “nothing of constitutional magnitude is involved” when a welfare aid recipient’s benefits are terminated as a consequence of the plaintiffs refusal to undergo a home visit, 400 U.S. at 324, 91 S.Ct. 381, the Court there was not faced with a situation in which coercion may have played a role. Indeed, Wyman’s statement that the plaintiffs “choice is entirely hers” suggests that the Court did not believe coercion was an issue at all. Id. Yet the Court has made clear since Wyman that the Fourth Amendment requires that consensual searches be voluntary and uncoerced. See Schneckloth v. *943 Bustamonte, 412 U.S. 218, 222-27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under the circumstances of this case, one cannot reasonably expect an individual who has made the difficult — and often desperate — decision to apply for welfare aid to then deny consent to a mandatory home visit when the consequence is denial of the application. Where such coercion is present, the option to refuse the home visit or the walk-through cannot reduce the intrusion on the applicant’s privacy any more than it can reduce the applicant’s privacy expectation in the home.
The majority finally concludes that the visits are “an effective method of verifying eligibility for benefits” and “provide an important deterrent effect.” Maj. Op. at 928. Even assuming that to be true — a point the Appellants dispute — and given that warrantless searches of the home are “presumptively unreasonable,” Payton, 445 U.S. at 586, 100 S.Ct. 1371, I cannot agree that these interests are “important enough to override the individual’s acknowledged privacy interest” in the home or are “sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion,” Chandler, 520 U.S. at 318, 117 S.Ct. 1295. “[T]he Fourth Amendment draws a firm line at the entrance to the house,” Kyllo, 533 U.S. at 40, 121 S.Ct. 2038 (internal quotation marks omitted), and the County’s home visits unreasonably cross it. Absent probable cause or at least a reasonable suspicion to believe an applicant has been less than truthful in his or her application, the Fourth Amendment prohibits the Project 100% home visits as they are conducted in this case. The majority errs in validating them as reasonable under the special needs doctrine.
III.
Because the home visits are unreasonable under the Fourth Amendment, they also violate the California constitutional right against unreasonable searches and the right to privacy. See Hill v. Nat’l Collegiate Athletic Ass’n, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633, 650 (1994) (“Under the Fourth Amendment and the parallel search and seizure clause of the California Constitution (art. I, § 13), the reasonableness of particular searches and seizures is determined by a general balancing test weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty.” (internal quotation marks omitted)); In re York, 9 Cal.4th 1133, 40 Cal.Rptr.2d 308, 892 P.2d 804, 813 (1995) (observing that the Article I § 1 privacy clause of the California Constitution does not establish broader protection than that provided by the Fourth Amendment or Article I § 13 of the California Constitution).
In addition, the Project 100% home visits violate the California unconstitutional conditions doctrine, for two reasons. First, the County has not established that the value to the public of its unreasonable home visit program “manifestly outweighs” the impairment of the welfare applicants’ constitutional rights. See Robbins v. Superior Court, 38 Cal.3d 199, 211 Cal.Rptr. 398, 695 P.2d 695, 704 (1985). Second, the County has not shown that “there are no available alternative means that could maintain the integrity of the benefits program without severely restricting a constitutional right.” Id.
The majority avoids this analysis altogether, reasoning that the County has not conditioned the receipt of welfare benefits upon the waiver of a constitutional right, because the home visits are reasonable, and the California and federal constitu *944 tions only create a right to be free from unreasonable searches. Maj. Op. at 931. Of course, the majority’s reasonableness holding is based in large part on its faith in the fraud investigators obtaining consent before entering the home or looking within it. But as I have explained, given the coercive nature of the home visit, the applicant’s consent should not weigh in favor of holding the visit reasonable.
Project 100% clearly makes the price of welfare assistance the waiver of both federal and state constitutional rights, with consent being coerced by the threat of denial of benefits. This is precisely the sort of conditioning of benefits that California’s unconstitutional conditions doctrine forbids.[14]
IV.
In Scott, we held that police may not conduct a search based on less than probable cause of an individual released while awaiting trial. The majority has tried to explain why those in need of public assistance to provide food, shelter and medical care for themselves and their families have less protection under the Fourth Amendment than those charged with a crime. I am not convinced.
Wyman does not support the majority’s unprecedented conclusion that no search occurs under the Fourth Amendment when a district attorney fraud investigator roams through a welfare applicant’s home, scrutinizing the most intimate and private of places, looking for evidence of ineligibility, fraud and crimes wholly unrelated to the welfare application. Because the County’s home visits violate the Fourth Amendment under both Wyman and the special needs cases, they also violate the California right against unreasonable searches, the right to privacy and the unconstitutional conditions doctrine. Although I concur in the majority’s holding that the state regulation prohibiting “[mjass and indiscriminate home visits” is inapplicable to Project 100%, see MPP § 20-007.33, I respectfully dissent from the remainder of the majority’s opinion.

. There is no dispute that the investigators make referrals for criminal investigation if they discover evidence of contraband, child abuse or a subject with outstanding felony warrants. On occasion, the investigators even arrange for arrests. [ER 85, Ex.7:107OS] The majority’s attempt to view the fraud investigators’ duty to report evidence of welfare fraud or other crimes as distinct from any "affirmative” requirement on the part of Project 100% is unavailing. See Maj. Op. at 921 - 922 n. 7. By utilizing sworn peace officers from the district attorney's office to conduct the home visits — rather than social workers from the County's welfare agency— Project 100% necessarily requires the investigators to look for and report evidence of fraud and other crimes.

. As peace officers under California Penal Code § 30.35, these fraud investigators have received training at law enforcement academies in interrogation techniques and arrest- and-control procedures. [ER 85, Ex. 5,2,7,8] According to Frank Reid, a supervising investigator for the San Diego County District Attorney, the investigators identify themselves to applicants by showing either a metal badge or folding identification card with the District Attorney logo, the District Attorney's name and the investigator’s name, photograph and badge number.[ER 85, Ex. 14:36-37] The majority's reliance on New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), to dismiss this differentiating aspect of the Project 100% home visits is misguided. See Maj. Op. at 924 n. 11. First, Burger did not address home visits by sworn peace officers, but rather whether warrantless searches by police officers of automobile junkyards (conducted pursuant to a statute authorizing them) fell within the exception to the warrant requirement for administrative inspections of "closely regulated” businesses. 482 U.S. at 693, 699-703, 107 S.Ct. 2636. The Court held that these searches were exempted, in part because "an operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy in this 'closely regulated' business.” Id. at 707, 107 S.Ct. 2636. Moreover, although Burger upheld the regulatory scheme against a Fourth Amendment challenge, the Court explicitly stated that both *935 the inspections and the overall scheme were, as the majority itself recognizes, "properly administrative." See Burger, 482 U.S. at 717, 107 S.Ct. 2636 ("So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.”) (emphasis added); see also id. at 693, 107 S.Ct. 2636 ("The case also presents the question whether an otherwise proper administrative inspection is unconstitutional ....”); id. at 716, 107 S.Ct. 2636 ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect.”) (emphases added). Unlike in Wyman, the record here demonstrates that neither the home visits as conducted nor the program as implemented are "properly administrative,” so Burger is inapposite.

. For example, according to the defendants, if the home visit reveals information that an applicant may have received CalWORKS benefits in the past for which the applicant was not entitled, the fraud investigator refers the case to the District Attorney's "full-field” division for criminal investigation and possible prosecution. [ER 85, Ex.7:105-06]

. Although the majority is correct that the federal welfare laws are the "same background against which San Diego’s welfare program is administered,” Maj. Op. at 921 n. 6, this does not demonstrate that the purpose of the Project 100% home visits is to provide "financial assistance and rehabilitation and other services ... to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life,” which was the case in Wyman. 400 U.S. at 315, 91 S.Ct. 381 (ellipses in original) (citation and internal quotation marks omitted). Indeed, the record in this case is to the contrary. I therefore cannot agree with the majority's bald assertion that there is "no greater showing of a rehabilitative purpose than there is in this case.” Maj. Op. at 921 n. 6.

.The majority's suggestion that I have mis-characterized the underlying purpose of the Project 100% home visit itself misreads the record in this case and misconstrues Wyman. I do not suggest that the underlying purpose of Project 100% is to investigate crimes other than welfare fraud, nor do I dispute that the home visit in Wyman was not a criminal investigation, did not "equate with a criminal investigation,” and was not “in aid of any criminal proceeding.” Wyman, 400 U.S. at 323, 91 S.Ct. 381. However, given the scope of the fraud investigators' duties and responsibilities — that they are charged not only with verifying eligibility but also with detecting welfare fraud and reporting evidence of other crimes — the same cannot be said of the home visits conducted by the County of San Diego.

. The majority finds comfort in the lack of evidence that applicants have ever been prosecuted for welfare fraud as a result of inconsistencies discovered during the visit. Maj. Op. at 924 n. 12. In light of the County’s concession that the visits can and do lead to prosecutions for other crimes — including past welfare fraud — I fail to see why it follows from the lack of prosecutions for current or attempted welfare fraud that the home visit does not rise to the level of a traditional Fourth Amendment search. It is clear that the home visits remain primarily investigative, notwithstanding that the County may not prosecute applicants for discrepancies in their applications. Moreover, that the home visits have not led to prosecutions for current welfare fraud might reflect that welfare applicants generally are not trying to cheat the government out of scarce public resources; or that many innocent and impoverished people are not committing welfare fraud and instead are having their privacy invaded; or that the fraud investigators are in fact interested mostly in discovering other types of crimes.

. The majority suggests that the Seventh Circuit’s decision in S.L. v. Whitburn, 67 F.3d 1299 (7th Cir.1995), supports its application of Wyman to the facts of this case. Maj. Op. at 921 n. 5. But the home visits in Whitburn are also distinguishable from those at issue here. First, the Milwaukee County Department of Social Services administered the home visit program through field representatives of a private investigative service whose only purpose was to verify eligibility. Law *937 enforcement agents do not appear to have played any role in the visits. Whitburn, 67 F.3d at 1302. Second, the home visits were not required of all first-time applicants. Rather, a caseworker would refer an applicant’s case to the investigative service only if he or she determined that the application needed further verification, and such verification "could include a home visit,” though one was not necessarily required. Id. (emphasis added). Third, although the home visits also required consent, the field representatives were prohibited from telling applicants that their benefits would be cut off if they refused to consent to the visit, thus lessening any concerns of coercion. Id. at 1308. By contrast, the County explicitly informs applicants through the Project 100% application packet, in posted notices and through an orientation video that the home visit must be completed before aid will be granted. ER 81, Ex. 11; ER 85, Ex. 23:1. Finally, unlike the case before us, Whitburn noted that ”[t]here is no evidence or reason to believe that an applicant who declines the home visit will be denied benefits even if satisfactory verification of eligibility is provided by some other means.’’ Id. at 1308 (emphasis added). Under Project 100%, the home visit must occur regardless of whether the information is available elsewhere, and as the County concedes, an applicant’s refusal to consent to a walk-through nearly always will result in a denial of benefits. See Maj. Op. at 919.

. I disagree with the majority’s contention that Kyllo is inapposite because it involved a "classic criminal law enforcement investigation conducted without the homeowner’s consent.” Maj. Op. at 927 n. 14. Notwithstanding the majority's attempt to read Kyllo narrowly, the Court there reaffirmed a core Fourth Amendment principle, namely "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." 533 U.S. at 31, 121 S.Ct. 2038 (emphasis added).

. The majority also asserts that the visits "alleviate the serious administrative difficulties associated with welfare eligibility verification,” but does not explain how such alleviation occurs. Maj. Op. at 925.

. Although the applicants are informed that the fraud investigators will visit their homes to "verify” and "check” information, it is hardly clear that they are given notice that the agents will perform a walk-through of the home and seek access to its most intimate parts in the course of their duties. For example, the CalWORKS application package contains a document titled "Notice to All CalWORKS Applicants — Home Call Verification,” which states: “A Fraud Investigator with the District Attorney’s Office will come to your home to verify the facts related to your application for public assistance. The Fraud Investigator may also make other contacts. County policy requires that a home call be completed to verify information given by all new applicants prior to granting ongoing CalWORKS.... The final eligibility determination will be made by the Eligibility Technician assigned to your case after the Fraud Investigator has completed their investigation.” (Emphasis added.)[ER 81, Ex.ll]

. Griffin appears to be the only case in which “special needs” permitted a warrant-less entry and search of anyone’s home.

. The majority’s conclusion to the contrary seems limitless and risks eroding the Fourth Amendment rights of various groups of people in this country. The government is a provider of countless benefits and services, many of which require verification of eligibility — such as disability benefits, Medicare and Medicaid benefits, veterans benefits, student financial aid grants and lunch subsidies for school students. If the majority is correct that a person’s expectation of privacy in the home is reduced any time he or she has a relationship *942 with the state that requires an eligibility determination, then there seems little to prevent the government from implementing a home visit program similar to Project 100% with respect to these beneficiaries as well.

. As the majority notes, Maj. Op. at 927 n. 15, Scott cited Wyman in dictum for the proposition that "government may sometimes condition benefits on waiver of Fourth Amendment rights — for instance when ... paying welfare benefits.” Scott, 450 F.3d at 868. However, as shown above, Wyman did not permit the wholesale conditioning of welfare benefits on waiver of Fourth Amendment rights any time the government pays them. Rather, Wyman held that the home visits "as structured by the New York statutes and regulations " did not amount to an "unwarranted invasion of personal privacy.” 400 U.S. at 326, 91 S.Ct. 381 (emphasis added). Neither Wyman nor Scott forecloses the conclusion that the Project 100% home visits are unconstitutional even though consent is given. Instead, "consent to any search is valid only if the search in question (taking the fact of consent into account) was reasonable.” Scott, 450 F.3d at 868.

. I agree with the majority that MPP § 20-007.33, the regulation prohibiting ''[mjass or indiscriminate home visits,” applies only to Special Investigative Units conducting for-cause investigations and therefore does not apply to this case.